**Opinion issued October 23, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00576-CV

———————————

**TROY SHANE REDDICK, Appellant**

**V.**

**JENNIFER EVE REDDICK, Appellee**

---

**On Appeal from the 311th District Court**
**Harris County, Texas**
**Trial Court Case No. 2005-41978**

---

## O P I N I O N

In this appeal, we consider whether the trial court abused its discretion by calculating appellant's child support obligation based on his earning potential

rather than his actual income after finding that he was intentionally underemployed. We reverse and remand.

## BACKGROUND

### *Events Leading to Trial*

Appellant, Troy Reddick, and appellee, Jennifer Reddick, were married for 15 years before divorcing in 2006. The final divorce decree provided that the parties would share equal custody of their three minor daughters and that Troy would pay $2000 per month in child support. Troy was also required to provide insurance for the children. Troy was awarded ownership of a business that he owned with his brother, Big E., Inc. d/b/a Cornerstone Measurement Solutions (hereafter, "Cornerstone"). Troy paid child support as ordered for three years, before he began missing payments or paying reduced amounts in December 2009. By the time of trial in November 2011, he was $19,805 in arrears. He continued paying the children's insurance.

Shortly after falling behind in his child support, Troy sought to have the Office of the Attorney General review his child support obligation. After a January 2011 negotiation conference with the Office of Attorney General, which was attended by both Troy and Jennifer, the Office of Attorney General recommended that Troy's child support be reduced to $300. After the Attorney

General filed a Petition for Confirmation of Non-agreed Child Support Review Order, Jennifer filed her Original Answer and Request for Hearing.

After Jennifer contested the confirmation of the child support review order, Troy retained counsel[1] to amend his petition and request temporary orders reducing his support. The trial court denied Troy's request for temporary orders, and the case, after several resets, proceeded to a bench trial in November 2011.

### Evidence Adduced at Trial

Troy testified at trial that, through the business he owned with his brother, Cornerstone, he sold and serviced measurement equipment for the surveying and construction industry. Troy was the president of Cornerstone and oversaw the operation of its business. In addition, he provided support for some of the high-tech products that Cornerstone sold.

Cornerstone was started in 1999, and was very successful for several years. In 2007, it made $200,000; in 2008, it made $100,000. However, in 2009, after Hurricane Ike, the "business started tapering off slowing but surely." Cornerstone's 2009 tax return shows that it lost $227,311 that year. Troy testified that in 2009, after "the economy turned," the business was unable to recover. Troy explained that his business relied on providing equipment and services to the construction industry and was tied to the declining housing market.

---

[1] According to testimony at trial, Troy's counsel was not being paid for his services.

Troy testified that "September of 2009 is when [Cornerstone] really started having trouble—issues." He was having difficulty making payroll and was not paying his vendors. Finally, in July 2010, the landlord locked the business out of its premises, so Troy finally "shut our doors" and ceased doing business.

The company was not dissolved, but it "ceased operations and just stopped." Troy testified that he quit trying to operate the business because "there's no income" and "very few assets." In September 2010, in an effort to recoup some of the value of the business, Troy negotiated a sale most of its assets to another company, Western Data Systems, for $27,060. At the time it ceased operations, Cornerstone owed vendors between $400,000 and $500,000. At least one of the vendors had filed suit to collect what it was owed.

Troy's 2009 tax return shows that he had a personal net income that year of $18,949. For 2010, his net income was $10,219. Troy's W-2 from Cornerstone for the year 2010 shows that Cornerstone paid him $18,932 in wages, which he testified that he used to pay child support. Troy testified that he liquidated two retirement accounts, which he then used to pay his living expenses. He remained current on his $2500 monthly mortgage, but fell behind on child support. He further testified that he had plans to file personal bankruptcy in the near future.

Regarding his efforts to find a job, Troy testified that four of Cornerstone's employees, including his brother, had gone to work for Western Data after it

4

purchased Cornerstone's assets. Although Troy too asked for a job, Western Data did not hire him because it already had seven or so employees who specialized in the high-tech equipment that Troy also specialized in servicing. Troy also testified that he first looked for a job within his industry, but he believed that he was "not employable" in that industry because he owed money to many of the companies in the industry. Tom testified that he had submitted several job applications through the Craigslist, Ladders, and Monster websites. In support of this testimony, Troy introduced his current resume into evidence, along with emails showing that his resume had been submitted to about a dozen companies. Troy also specifically testified about applications that he had made to Tuff Shed, Hewlett Packard, and Texas Doctor Awards. However, none of his attempts had been successful. As a result, Troy testified that he had begun working for his wife's landscaping company, where he had earned approximately $4,500 in each of 2010 and 2011. He also testified that he planned to begin professional truck driving school in the month following the trial.

Jennifer also testified at trial. When questioned about Troy's employment abilities, the following exchange took place:

> Q. Having lived with Mr. Reddick for 15 years or more, have three children with him, having been married to him, do you have an opinion of what he is capable of making?
>
> A. Yes.

5

Q. What is that opinion? How much do you think he can make?

A. I mean, I believe he can make upwards of 75 to $100,000 a year at least.

Q. All during your marriage he did it?

A. Correct.

Q. Made that much and more; right?

A. Correct.

On cross-examination, when questioned about Troy's employment abilities, Jennifer testified as follows:

Q. Do you think Mr. Reddick is intentionally underemploying himself?

A. Yes.

Q. Do you think he's doing that why?

A. I would have no idea, but I know what he's capable of doing and it's more than mowing yards.

Q. You don't know why, you just think he's doing it?

A. Yeah.

Q. Well, take it piecemeal. Do you believe that [Cornerstone] became insolvent?

A. I believe it was salvageable. I do.

Q. How long has it been since you worked at [Cornerstone]?

A. Since '06.

Q. I'm sorry. You stopped working in '06?

A. Correct.

Q. So, you really don't know what happened at [Cornerstone] since then?

A. No, but I know him and what he's capable of.

Q. And you think that's all that matters, not the market, not the housing starts, not the surveying business?

A. I know other competitors that are still doing well.

Q. What do you do for a living?

A. I work for a trade school as a staffing specialist. I find jobs for our graduates.

Q. At a trade school?

A. Yes.

Q. What type of trade school is that?

A. It's called ATI; and we have dental assisting, medical assisting, massage therapy and some trades.

Q. So it's in the medical field?

A. Part of it, yes.

Q. So, you really don't have any expertise to say what Mr. Reddick is capable of?

A. My expertise is knowing the kind of man he is and what he can do and what he's done in the past. I know the jobs he's had.

* * * *

7

Q. You don't have any specialized training or education in the type of market that he was involved in with [Cornerstone], do you?

A. No.

Q. But you did testify, nonetheless, that he is capable of making upwards of $75,000 a year?

A. Correct.

Jennifer presented no evidence of Troy's educational background or work experience, but the resume admitted at trial shows that he has a high school diploma from JA Fair High School, with 7 years' experience as a sales manager and one year as a business development manager before starting Cornerstone.

*Post-Trial Proceedings*

Three months after trial, on March 2, 2012, the trial court signed the order lowering Troy's child support from $2000 per month to $1875 per month, and otherwise denying Troy's motion to modify. On March 8, 2012, the trial court denied Troy's Motion for New Trial. On June 12, 2012, Troy filed his Notice of Appeal.[2]

---

[2] In her appellee's brief, Jennifer contends that Troy's appeal was not perfected because his notice of appeal was untimely. The trial court's judgment was signed on March 2, 2012. Because he timely filed a motion for new trial, Troy had until June 2, 2014 to file his notice of appeal. Troy filed his notice of appeal on June 12, 2012. We will imply a motion for extension of time to file a notice of appeal when, as here, an appellant, acting in good faith, files a notice of appeal beyond the time allowed by TEX. R. APP. P. 26.1, but within the fifteen-day grace period provided by TEX. R. APP. P. 26.3 for filing a motion for extension of time. *See Verburgt v. Dorner*, 959 S.W.2d 615, 617–18 (Tex. 1997).

8

On March 25, 2013, after the briefs were filed raising the issue of Troy's intentional underemployment, this Court abated this case and ordered the trial court judge to make a finding of whether or not Troy was intentionally unemployed or underemployed and any other findings and recommendations relating to the intentional underemployment issue that the trial court deemed appropriate. *See Iliff v. Iliff*, 339 S.W.3d 74, 82 (Tex. 2011). Because the findings were not timely filed in this Court by supplemental clerk's record as ordered, this Court issued a Continuing Order of Abatement on October 1, 2013, again ordering the *Iliff* findings. A supplemental clerk's record was then filed in this Court, containing the following finding:

> The Court finds that Troy Shane Reddick is intentionally underemployed, and further finds that Troy Shane Reddick has the potential to earn $6,500.00 per month, net.

This Court permitted supplemental briefing from both parties to address the trial court's finding. Only Troy filed a supplemental brief.

**INTENTIONAL UNEMPLOYMENT OR UNDEREMPLOYMENT**

In two related issues on appeal, Troy contends the trial court erred in basing his $1875 child-support obligations on his potential, rather than actual earnings.

*Standard of Review*

Most of the appealable issues in a family law case, including child support, are evaluated against an abuse of discretion standard. *See In re A.B.P.*, 291 S.W.3d

9

91, 95 (Tex. App.—Dallas 2009, no pet.); *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without any reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *see also Gonzalez v. Gonzalez*, 331 S.W.3d 864, 866 (Tex. App.—Dallas 2011, no pet.).

In family law cases, legal and factual sufficiency challenges do not constitute independent grounds for asserting error, but are relevant factors in determining whether the trial court abused its discretion. *Moore v. Moore*, 383 S.W.3d 190, 198 (Tex. App.—Dallas 2012, pet. denied). To determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion, and (2) erred in its application of that discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of the test. *Id.* We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Id.*

*Applicable Law*

The Texas Family Code provides that "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the [trial] court may apply the support guidelines to the earning potential of the obligor." TEX. FAM. CODE ANN. § 154.066 (Vernon 2008). "While the permissive word 'may' imports the exercise of discretion, 'the court is not vested with unlimited discretion, and is required to exercise a sound and legal discretion within the limits created by the circumstances of a particular case.'" *Iliff*, 339 S.W.3d at 81 (quoting *Womack v. Berry*, 156 Tex. 44, 291 S.W.2d 677, 683 (1956)). "Moreover, in child support decisions, the 'paramount guiding principle' of the trial court should always be the best interest of the child." *Id.* (citing *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993)).

"The law has long recognized parents have a legal duty to support their children during their minority." *Id.* (citing *Yarborough v. Yarborough*, 290 U.S. 202, 221, 54 S. Ct. 181, 189 (1933)). "A parent who is qualified to obtain gainful employment cannot evade his or her child support obligation by voluntarily remaining unemployed or underemployed." *Id.* "Concurrently, the court must consider 'a parent's right to pursue his or her own happiness' with a parent's duty to support and provide for his or her child." *Id*. at 81–82. (quoting *In re E.A.S.*, 123

S.W.3d 565, 570 (Tex. App.—El Paso 2003, pet. denied)). "The court must engage in a case-by-case determination to decide whether child support should be set based on earning potential as opposed to actual earnings." *Id*. at 82.

"Once the obligor has offered proof of his or her current wages, the obligee bears the burden of demonstrating that the obligor is intentionally unemployed or underemployed." *Id.* "The burden then shifts to the obligor, if necessary, to offer evidence in rebuttal." *Id.*

Trial courts should be cautious of setting child support based on earning potential in every case in which an obligor makes less money than he or she has in the past. *Id*. "Although some financial resources are indispensable to raising and providing for a child, the financial analysis will often not be the end of the court's consideration." *Id*. "A court properly considers the obligor's proffered rebuttal evidence of the reasons for an obligor's intentional unemployment or underemployment." *Id.* "This includes such laudable intentions by obligors who alter their employment situations to spend more time with their children, to live closer to their children in order to attend their events and be more involved in their lives, or to provide their children with better health benefits." *Id.* "Other objectives are also factors, such as whether an obligor alters his or her employment situation to start a new business, to gain further education, to become a public servant, or to address health needs." *Id*. "An active but unfruitful pursuit of employment may

also be relevant to the court's child support determination, as well as economic conditions that legitimately preclude full employment." *Id.*

"But, we are mindful that such explanations are not always sincere, and the judge as fact finder has latitude to consider the testimony and evidence to make the necessary determinations." *Id.* (citing *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981)). "Such discretion must be exercised within the limits set by the Texas Family Code, particularly Chapter 154 including the child support guidelines, and should always focus on the best interest of the child." *Id.*

"To facilitate appellate review and to encourage consistency in the exercise of this discretion across the state, the trial court must make a finding of intentional unemployment or underemployment and its decision to base child support on earnings potential rather than actual earnings must be supported by the record." *Id.*

*Analysis*

Troy contends that the trial court erred in finding him to be intentionally underemployed because he met his burden under *Iliff* to offer proof of his current wages, and that Jennifer failed to meet her burden under *Illiff* to show that he was intentionally underemployed. Troy further contends that, even if Jennifer showed intentional underemployment, he presented sufficient rebuttal evidence to preclude the trial court from using his potential income, rather than his actual income.

We agree that Troy met his burden to show his current wages by introducing his tax returns and testifying about his $24,000 annual income. Thus, the burden shifted to Jennifer to demonstrate that Troy was intentionally underemployed. Thus, we will review the record to determine whether Jennifer carried her burden to show that Troy "consciously chose" to remain un- or underemployed. *Illif*, 339 S.W.3d at 80.

In *Iliff*, the evidence showed that the father voluntarily quit a job making $102,000 a year and moved in with his own mother, who testified that he did not help with the household expenses or upkeep of the house. *Id.* at 83. The father spent most of his time reading and watching television. *Id.* He had a B.S. degree, an M.B.A. degree, and almost 20 years' experience in the chemical industry. *Id.* The father sporadically did some consulting or tractor work, resulting in an estimated $200 per month. *Id.* Although there were suggestions of psychological issues, the father refused to undergo a psychological examination. *Id.* He admitted to being able to work, but did not provide evidence that he had actively sought employment after his tractor business foundered. *Id.* The supreme court held that, on this record, the trial court did not abuse its discretion in basing its child support order on the father's potential earning capacity of $60,000 per year. *Id.*

In *Pavon v. Hernandez*, No. 14-10-00059-CV, 2011 WL 1631790, at *2 (Tex. App.—Houston [14th Dist.] April 28, 2011, no pet.) (memo. op.), the

14

defendant introduced evidence of net monthly income in the amount of $500, but the trial court set his child support based on a potential income of $3,800 per month. *Id.* Father claimed that he had sold his business to his live-in girlfriend, and that she paid him only $500 per month toward it. *Id.* The court held that there was sufficient evidence of intentional unemployment because the trial court could have reasonably believed that the sale of appellant's business to his girlfriend was a sham, and that Father was, in fact, still deriving profits from that business. *Id.*

In *Trumbull v. Trumbull*, 397 S.W.3d 317, 320 (Tex. App.—Houston [14th Dist.] 2013, no pet.), the husband produced evidence that he earned $2000 per month, and that with commissions included, his salary was less than $30,000 per year. *Id.* The trial court, however, set his child support based on an earning potential of twice that amount. *Id.* Wife testified before the trial court that husband "is capable of earning $60,000 per year 'if he applies himself.'" *Id.* Wife also testified that husband had occasionally earned supplemental income during the marriage by installing car and boat accessories on the weekend. *Id.* The court, noting that "to support a finding of intentional underemployment, it is not enough to simply establish that the obligor is failing to maximize his potential," held that there was insufficient evidence of intentional underemployment. *Id.* The Court noted that Wife's explanation that Husband could earn more money if "he applied

himself" was not evidence of intentional underemployment without further explanation about how "this 'application' might be realized. *Id.*

This case is not like *Iliff*. In *Iliff*, the father voluntarily quit his job to stay home, live with his mother, and mostly watch television. *Illif*, 339 S.W.3d at 83. Here, it is true that Troy voluntarily sold his business, but he did so only after it was deeply in debt, being pursued legally by creditors, and being locked out of its premises by a landlord for failing to pay its lease. In *Iliff*, the father had a B.S. in science, an M.B.A., and 20 years' experience in the chemical industry. *Id*. Here, Jennifer provided no evidence of Troy's educational background or work experience, but the resume that Troy himself introduced into evidence shows a high school diploma and several years in sales before starting his business, which ultimately failed. In *Iliff*, "there was little evidence that [the father] had actively sought other comparable employment . . . ." *Id.* Here, Troy sought work first from the company that bought his business, and then with at least a dozen other companies, all without success. He finally went to work for his wife's landscaping company making minimum wage. Troy also testified that, because he had not been able to find work in sales or in his previous industry, he had plans to go to school to become a commercial truck driver. In fact, the record shows that, at the time of judgment, three months after the trial, Troy was starting work as a truck driver.

16

Similarly, this case is not like *Pavon*. In *Pavon*, as in this case, the father was unemployed because he sold his business. 2011 WL 1631790 at *2. However, in that case, the evidence showed that the father sold his business to his live-in girlfriend, thus the trial court could have reasonably concluded that the father continued to derive profits from it despite claiming that his girlfriend gave him only $500 per month for it. *Id.* Here, it is undisputed that Troy sold the assets of his business to a former competitor for salvage value, and that the company is no longer earning any income.

Instead, this case is more like *Trumbull*. In *Trumbull*, the wife testified that the husband could earn $60,000 "if he applies himself." 397 S.W.3d at 320. Here, Jennifer testified that Troy could "make upwards of 75 to $100,000 a year at least" because he had done so throughout their marriage. However, "trial courts should be cautious of setting child support based on earning potential in every case where an obligor makes less money than he or she has in the past." *Iliff*, 339 S.W.3d at 82. Jennifer also testified that she did not know why Troy was underemployed, but that but she knew "what he's capable of doing and it's more than mowing yards." The *Trumbell* court concluded that the wife's testimony that the husband could do more "if he applies himself" was insufficient to show underemployment absent further evidence from the wife about how the husband could apply himself. 397 S.W.3d at 320. Similarly, we believe that Jennifer's testimony that Troy is capable

17

of more than mowing yards is insufficient to show underemployment absent evidence of how he might do more. Instead, Jennifer produced no evidence of any missed opportunities or deliberate choices by Troy to remain unemployed, and indeed, the record shows that Troy has actively been pursuing employment since Cornerstone shut its doors.

Nevertheless, Jennifer argues that the trial court could have disbelieved Troy's testimony about his financial condition. She specifically points out that, *while Cornerstone was operating* it paid several of Troy's expenses, such as his car and his cell phone, and that his profit/loss statement for Cornerstone shows several hundred thousand dollars in miscellaneous debts. This argument only addresses Troy's financial condition before Cornerstone was sold; it does not address whether he continued to receive any benefit from Cornerstone after its assets were sold. While it is true that the trial court is the ultimate judge of credibility, here, we ordered the trial court to "[m]ake any other written findings and recommendations [it] deems appropriate regarding the intentional unemployment or underemployment issue." There is no finding that the trial court found Troy to be not credible.

Jennifer presented no evidence of Troy's earning capacity other than her belief that he could "do more than mowing grass," which was admittedly based on the fact that he had made more money in the past. Further, even if we were to

18

disregard the evidence presented by Troy, Jennifer presented no other evidence to carry her burden of showing intentional underemployment other than her own testimony that she "kn[ew] what he was capable of doing," and that he could earn between $75,000 and $100,000 per year, without any explanation of how he could accomplish that level of earning.

As such, we conclude that Jennifer failed to carry her burden to show that Troy was intentionally underemployed because he "consciously chose" to be so. We cannot say that, under the facts of this case, Troy's decision to sell his failing business was a deliberate choice to become and remain unemployed. As such, the trial court abused its discretion when it based Troy's child support obligation on earning potential rather than actual income.

We sustain Troy's first issue on appeal.

Troy also contends the trial court erred in not modifying his support obligation retroactively to the date of filing. In light of our disposition of his first issue, we need not address this issue and decline to do so. The trial court may reconsider the retroactivity issue on remand.

**CONCLUSION**

We reverse the trial court's judgment and remand for further proceedings.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.