**Opinion issued July 14, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00350-CV

_____

### THURMAN H. WEST, Appellant

### V.

### GWENDOLYN MESHALLE WEST, Appellee

On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Case No. 55385

## MEMORANDUM OPINION

Appellant, Thurman H. West, challenges the trial court's final decree in his suit for divorce from appellee, Gwendolyn Meshalle West. Following a trial to the court, the trial court divorced the parties, divided their marital estate, and imposed

child support obligations on Thurman.  In five issues, Thurman contends that the trial court erred in finding him intentionally underemployed and setting his child support obligation above the statutory guidelines,[1] mischaracterizing and distributing property, and awarding Gwendolyn her attorney's fees.

We affirm in part and reverse and remand in part.

## Background

In his petition, Thurman sought a divorce from Gwendolyn, whom he married in 1997.  He requested joint managing conservatorship of their three children, with the exclusive right to determine their primary residence, exclusive use and possession of the family's house, and an order enjoining Gwendolyn from entering the premises.  In her counter-petition for divorce, Gwendolyn requested joint managing conservatorship of the children, with the right to determine their primary residence, exclusive use and possession of the house, temporary spousal maintenance, and attorney's fees.  After the trial court entered temporary orders granting Thurman exclusive use and possession of the house, Gwendolyn and the children moved to a rental property.

At trial, Thurman testified that he is the pastor, executive director, president, and registered agent of Southeast Community Church (the "church").  In 2003, the church wanted to purchase a house to serve as a parsonage for Thurman and any

---

[1] *See* TEX. FAM. CODE ANN. §§ 154.125–.126 (Vernon 2014).

2

future pastor. Because the church was unable to secure financing, Thurman and Gwendolyn purchased the house in their names. The church paid the down payment and thereafter gave Thurman an annual housing allowance to pay the note, insurance, and expenses. And, from 2003 to 2010, Thurman and Gwendolyn lived with their children in the house. Thurman explained that all understood from the beginning that he and Gwendolyn would deed the house to the church. And in 2005, Thurman and Gwendolyn executed a deed conveying the house to the church. In 2007, however, when interest rates improved and the church wanted to refinance the mortgage loan, the church deeded the house back to Thurman and Gwendolyn. After they obtained refinancing, Thurman deeded his interest back to the church. Gwendolyn, however, did not. Thurman stipulated at trial that he did not own an interest in the house.

Gwendolyn testified that she had never intended to deed the house to the church. She and Thurman had purchased the house together, were each named on the note, and the payments were made with Thurman's income. She further testified that from 2006 to 2009, she was employed as the church's bookkeeper. And Thurman's annual income, which had ranged from $69,000 to $75,000 during that period, was comprised of a salary in the amount of $32,000 to $35,000 and periodic "gifts" and allowances from the church and congregation. In addition, the church had annually, during the preceding ten years, given Thurman a housing

3

allowance of $50,000, from which he paid the mortgage note, insurance, and house expenses.

In its final decree, the trial court awarded each party approximately $75,000 to $80,000 in assets. It awarded Thurman the house, which had a market value in 2013 of $278,140 and in which the community estate had equity of $60,433, certain household items, and the sums in various accounts. And it awarded Gwendolyn certain household items, the family's cemetery lots, and the sums in various bank and investment accounts. It further appointed Thurman and Gwendolyn as joint managing conservators of the children, found Thurman "intentionally underemployed," and ordered him to pay $1,906 monthly in child support.

## Standard of Review

Most of the appealable issues in a family-law case, including property division incident to divorce and child support, are evaluated for an abuse of discretion. *Reddick v. Reddick*, 450 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2014, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without any reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

In family-law cases, legal- and factual-sufficiency challenges do not constitute independent grounds for asserting error, but are relevant factors in

4

determining whether the trial court abused its discretion. *Moore v. Moore*, 383 S.W.3d 190, 198 (Tex. App.—Dallas 2012, pet. denied). To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its application of that discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of the test. *Id.* We then determine whether, based on the evidence, the trial court made a reasonable decision. *Id.* A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Id.* When, as here, a trial court does not issue findings of fact and conclusions of law, we will affirm the trial court's judgment if it can be upheld on any legal theory supported by the evidence. *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987).

## Child Support

In his first and second issues, Thurman argues that the trial court erred in setting his child support payments above the statutory guidelines because there is no evidence to "rebut the presumption in favor of monthly child support based on [the] guidelines" or that he is "intentionally underemployed."

A trial court has discretion to set child support within the parameters provided by the Texas Family Code, which establishes guidelines for setting monthly child support obligations in suits affecting the parent-child relationship. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *see also* TEX. FAM. CODE ANN. §§ 154.121–.133 (Vernon 2014). These guidelines are presumptively reasonable. TEX. FAM. CODE ANN. § 154.122(a). The trial court may order child support payments in an amount that varies from the guidelines "if the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines." *Id*. § 154.123(a). In determining whether an application of the child support guidelines would be unjust or inappropriate in a particular case, the court is to consider evidence of all relevant factors. *Id.* § 154.123(b) (listing factors). And the trial court is required to make specific findings supporting any such variance. *Id*. § 154.130(a)(3), (b).

Thurman first argues that the trial court erred in ordering him to pay $1,906 per month in child support because there is no evidence to rebut the presumption in favor of applying the guidelines. Child support is to be calculated by applying the statutory guidelines to the obligor's "monthly net resources." *See id.* §§ 154.062(a), 154.124. A trial court "shall calculate net resources for the purpose of determining child support liability" by first adding all resources, including:

(1)     100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses);

(2)     interest, dividends, and royalty income;

(3)     self-employment income;

(4)     net rental income (defined as rent after deducting operating expenses and mortgage payments, but not including noncash items such as depreciation); and

(5)     all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits other than supplemental security income, United States Department of Veterans Affairs disability benefits other than non-service-connected disability pension benefits, as defined by 38 U.S.C. Section 101(17), unemployment benefits, disability and workers' compensation benefits, interest income from notes regardless of the source, gifts and prizes, spousal maintenance, and alimony.

*Id.* § 154.062(b). The trial court then "shall deduct the following items from [the gross] resources to determine the net resources available for child support":

(1)     social security taxes;

(2)     federal income tax based on the tax rate for a single person claiming one personal exemption and the standard deduction;

(3)     state income tax;

(4)     union dues;

(5)     expenses for the cost of health insurance or cash medical support for the obligor's child ordered by the court under Section 154.182; and

(6)     if the obligor does not pay social security taxes, nondiscretionary retirement plan contributions.

*Id.* § 154.062(d).

7

Here, Gwendolyn testified that in 2009, the church paid Thurman a "taxed income" of $35,000. Thurman's paystubs, which were admitted into evidence, show that in 2013 the church paid him a salary of $36,244. The final paystub shows a total deduction in 2013 of $5,594 for taxes based on a married person with one allowance. Applying the Texas Attorney General's child support chart to calculate the net monthly resources for a single taxpayer claiming one personal exemption, Thurman's monthly net resources from his salary are $2,485. *See* TEX. FAM. CODE ANN. § 154.061(b) (containing chart).

Thurman and Gwendolyn also testified that Thurman receives regular "gifts" from the church and its congregation.[2] Specifically, he receives an anniversary gift of $16,000 to $25,000; "love gifts" totaling $1,600 to $4,400 annually; and $2,400 to $3,000 annually in honorariums. Thurman also testified that he receives a weekly expense allowance of $200, which "must be considered." Taking the lowest asserted value of each item, these gifts and allowances to Thurman total $30,400 annually, or $2,533 monthly. Thurman also testified that for ten years prior to the hearing, he had been receiving an annual lump sum of $50,000 from the church as a housing allowance. Although he no longer receives such a lump sum, he testified that the church still pays the note on the house, insurance, and "all

---

[2] Thurman does not assert that these "gifts" and allowances do not constitute "income" or "resources" for computing child support. *See* TEX. FAM. CODE ANN. § 154.062(b).

8

house expenses." And he noted that all of the gifts and expense allowances are non-taxable. The church also pays for the children's health insurance. Thus, evidence supports a finding that Thurman's monthly net resources total $9,185.

When, as here, an obligor's monthly net resources exceed $7,500, a trial court shall apply the presumptive percentage guidelines to the portion of the obligor's net resources that does not exceed that amount, and it may order additional amounts "as appropriate, depending on the income of the parties and the proven needs of the child." *Id*. § 154.126. For three children, the guidelines provide that child support is to equal thirty percent of the obligor's net resources. *Id*. § 154.125(b). Thus, as applied to the first $7,500 of Thurman's monthly income, his monthly child support obligation is $2,250. The trial court actually ordered Thurman to pay, in monthly child support, $1,906, which is below the guideline.

Viewing the evidence in the light most favorable to the trial court's decision and indulging every reasonable presumption in favor of the trial court's judgment, we hold that the evidence supports the trial court's child support calculation, even without a finding of intentional underemployment. *See In re H.D.C.*, —S.W.3d—, No. 14-13-00976-CV, 2014 WL 6464331, at *7 (Tex. App.—Houston [14th Dist.] Nov. 18, 2014, no pet.) ("A trial court does not abuse its discretion when its decision is based on conflicting evidence or where some evidence of a probative

and substantive character exists to support the child-support order.").  Accordingly, we need not address Thurman's second issue, in which he contends that the trial court erred in finding that he is intentionally underemployed.

We overrule appellant's first issue.

## Property Division

In his third and fourth issues, Thurman argues that the trial court erred in "mischaracterizing" the house and certain bank accounts as community property and including them in its division of the marital estate.

In a decree of divorce, a court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party. TEX. FAM. CODE ANN. § 7.001 (Vernon 2006). Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. *Id.* § 3.003(a).  This presumption is rebuttable, requiring a spouse claiming an asset as separate property to establish its separate character by clear and convincing evidence.  *Id*. § 3.003(b).  Property owned before marriage, or acquired during marriage by gift, devise or descent, constitutes "separate property." *Id.* § 3.001.

The mischaracterization of community property as separate property is not reversible unless the mischaracterization had more than a de minimus effect on the just and right division.  *McElwee v. McElwee*, 911 S.W.2d 182, 189 (Tex. App.—

10

Houston [1st Dist.] 1995, writ denied). However, the mischaracterization of separate property as community property is not subject to a harm analysis because divestiture of separate property constitutes reversible error. *Id.* If reversible error affecting the "just and right" division of the community estate is found, an appellate court must remand the entire community estate for a new division. *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *McElwee*, 911 S.W.2d at 189.

*Bank Accounts*

In his fourth issue, Thurman specifically argues that the trial court erred in characterizing the funds in two of his bank accounts as community property and including them in its property division because the funds consisted solely of "gifts" to him from the church and congregation and were, thus, his separate property.

Property acquired during marriage by gift constitutes separate property. TEX. FAM. CODE ANN. § 3.001. A gift is a transfer of property made voluntarily and gratuitously, without consideration. *In re Marriage of Skarda*, 345 S.W.3d 665, 671 (Tex. App.—Amarillo 2011, no pet.). Salaries and wages earned by the parties during marriage, however, constitute community property. *Bell v. Moores*, 832 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

Thurman testified that the money in two of his bank accounts, "Comerica Bank x957" and "Chase Bank x830," was given to him by the church and congregation and was his separate property. *See* TEX. FAM. CODE ANN. § 3.001.

11

He notes that Gwendolyn also testified that the money was given to him, and she did not controvert his evidence or list either of the accounts as part of the community estate on her inventory. Nevertheless, the trial court awarded Gwendolyn $12,000 of the $14,000 in these accounts.

Although Gwendolyn did testify that certain monies received from the church were "gifts," she further testified that the various "gifts" received from the church constituted "income." And she expressly asked the trial court to award her "one-half" of the money in the accounts.

Again, property possessed by either spouse during or on dissolution of marriage is presumed to be community property. *Id.* § 3.003(a). And Thurman had the burden to rebut this presumption by establishing the separate character of the funds by clear and convincing evidence. *See id.* § 3.003(b). Thurman argues only that the monies he receives from the church and congregation are "gifts" because they are given to him only "as an expression of . . . love and in celebration of his anniversary." However, he cites no authority to support his argument.

Courts have held that while an occasional unsolicited gift from a church congregant to a pastor may constitute a "gift," where a religious institution is intrinsically involved in facilitating the collection of funds from congregants for its pastor under a regularly conducted program, and the pastor receives little other compensation, the contributions constitute income. *Banks v. C. I. R.*, 62 T.C.M.

12

(CCH) 1611 (T.C. 1991) (holding contributions from congregants to pastor on four "special days" each year, including church anniversary and pastor's birthday, constituted compensation for services rendered).

Thurman testified that each year he receives an anniversary and birthday gift in the range of $16,000 to $24,000. And every fifth Sunday, he receives a "love gift" of approximately $1,150. Gwendolyn, who was employed as the church's bookkeeper, explained that the church took a collection from the congregation to pay these gifts. And the gifts have a total value almost equivalent to Thurman's $35,000 salary. Thus, the evidence establishes that the church is substantially involved in facilitating the collection of funds from its congregants for the benefit of Thurman under a regularly conducted program; therefore, these contributions constitute income. *See id.* And income earned by the parties during marriage constitutes community property. *Bell*, 832 S.W.2d at 752. Because Thurman has not, by clear and convincing evidence, rebutted the presumption that the funds that he regularly receives from the church and its congregants constitute community property, we hold that the trial court did not err in characterizing the funds held in the two bank accounts at issue as community property.

We overrule Thurman's fourth issue.

***The House***

In his third issue, Thurman specifically argues that the trial court erred in characterizing the house as community property and awarding it to him in the property division as such because there is no evidence that he owns an interest in the house.

Thurman testified that he transferred his interest in the house to the church by warranty deed in 2007, and he stipulated that he had "no interest in the property due to the contents of [the] deed[]." Further, the trial court admitted the 2007 warranty deed into evidence. In its final decree, however, the trial court awarded the entire house to Thurman in its property division.[3] And the record reflects that the house constitutes the parties' largest asset.

In disposing of the property of the parties, a trial court may consider the homestead character of any of the property, separate or community.[4] *Laster v. First Huntsville Props. Co.*, 826 S.W.2d 125, 129 (Tex. 1991).

---

[3] The church appeared at trial through counsel, but it is not a party to this appeal.

[4] Thurman asserts that after the trial, the trial court issued a "rendition letter" suggesting that he could not have conveyed his interest in the house to the church without Gwendolyn's joinder. *See* TEX. FAM. CODE ANN. § 5.001 (Vernon 2006) (governing sale or encumbrance of homestead property). He also asserts that the trial court "invalidate[d]" his 2007 warranty deed because Gwendolyn did not also sign it. Although Thurman asserts that he requested a supplemental clerk's record containing the trial court's letter, a record has not been filed. Prejudgment letter rulings, however, do not constitute formal findings of fact. *In re Shockley*, 123 S.W.3d 642, 648 (Tex. App.—El Paso 2003, no pet.).

14

Here, it is undisputed that Gwendolyn did not sign the 2007 warranty deed.

Although the record shows that Thurman's trial counsel referred to the house as

homestead property several times during trial, neither Thurman nor Gwendolyn

testified that the house was homestead property. In fact, when counsel asked

Thurman if the house was "homesteaded" to him, Thurman answered, "No."[5]

Gwendolyn asserts on appeal, however, that "[s]ince the purchase of the house in

---

We note, however, that Thurman raised the issue in his motion for new trial, as follows:

> In the Court's divorce rendition dated January 14, 2014, the Court determined that the [house] was still owned by [Thurman] and [Gwendolyn] and was, therefore, part of the community estate. . . . [I]n the Final Decree of Divorce signed on February 14, 2014, the Court awarded [Thurman] the [house] with an equity value of $60,000.00 based on Respondent's Inventory and Appraisement. In support of the Court's decision that the [house] was still owned by [Thurman] and [Gwendolyn] and was, therefore, part of the community estate, the Court cited Texas Family Code Section 5.001.

And Thurman asserted that a "conveyance by a husband, not joined by his wife, of the homestead property, is merely inoperative while the property continues to be a homestead, or until such time as the homestead may be abandoned, or the deed ratified." *See Grissom v. Anderson*, 79 S.W.2d 619, 621 (Tex. 1935). At the hearing on his motion for new trial, Thurman also asserted that the trial court erred in invalidating the deed and awarding him the property as part of its division of the community estate. The trial court denied his motion for new trial.

[5] We note that it is possible, however, that Thurman may have been referring to whether a homestead exemption for tax purposes had been filed. "Homestead status" is not dependent on ownership or the designation of property as a homestead for tax purposes. *See Denmon v. Atlas Leasing, L.L.C.*, 285 S.W.3d 591, 595 (Tex. App.—Dallas 2009, no pet.) (noting person may have homestead rights in spouse's separate property).

15

2003, up until the divorce proceedings, [she and Thurman] and their children lived together on the property *and held it out as their homestead*." (Emphasis added.)

"Whether [a] homestead is the separate property of either spouse or community property, neither spouse may sell, convey, or encumber the homestead without the joinder of the other spouse except as provided in this chapter or by other rules of law." TEX. FAM. CODE ANN. § 5.001 (Vernon 2006). "An owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law." TEX. CONST. art. XVI, § 50(b).

It has been held that a husband's deed, not signed by his wife, conveying a homestead property passes no title or "right to title." *Higgins v. Bankers' Mortg. Co.*, 13 S.W.2d 683, 684 (Tex. Comm'n App. 1929, no writ). More recently, however, it has been recognized that "Texas courts have adhered strictly to the principle that one-spouse homestead transactions are not void, but merely inoperative while the property remains the non-signing spouse's homestead." *Villarreal v. Laredo Nat'l Bank*, 677 S.W.2d 600, 609 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.); *see also Grissom v. Anderson*, 79 S.W.2d 619, 621 (Tex. 1935); *Zable v. Henry*, 649 S.W.2d 136, 137 (Tex. App.—Dallas 1983, no writ); *Day v. Edmonds*, No. 11-04-00135-CV, 2005 WL 2090685, at *3 (Tex. App.—Eastland Aug. 31, 2005, no pet.) (mem. op.); *Cummings v. Gillespie*, No. 12-01-

00046-CV, 2002 WL 452285, at \*2 (Tex. App.—Tyler Mar. 20, 2002, pet. denied) (not designated for publication). On the termination of a homestead, title passes to the grantee. *Geldard v. Watson*, 214 S.W.3d 202, 208 (Tex. App.—Texarkana 2007, no pet.).

Thus, Thurman's 2007 conveyance of his interest in the house to the church was not void. Rather, it was inoperative against the continuing homestead claim of the non-joining spouse, Gwendolyn. However, once the trial court, in its final decree, divested Gwendolyn of "all right, title, interest, and claim" in the property, Thurman's deed to the church became operative. *See id.*

Thurman's 2007 general warranty deed to the church shows that he conveyed "*all* of the following described real property . . . [description of the house]." (Emphasis added.) And the deed notes that there were no reservations. At the time of the conveyance, Gwendolyn owned the house with Thurman. However, the trial court, in its final decree, awarded to Thurman "as his sole and separate property" the entire house. And where, as here, a grantor conveys, by way of a warranty deed, a greater estate or interest than he or she has, such warranty deed operates, by way of estoppel, to pass to the grantee any title or interest thereafter acquired by the grantor. *See Hous. First Am. Sav. v. Musick*, 650 S.W.2d 764, 770 (Tex. 1983) (title subsequently acquired to land by warrantor or

17

seller passes "eo instante" to his warrantee or buyer).  Thus, once the Thurman's deed became operative, title to the house passed to the church.

Because the evidence establishes that the house was not part of the community estate subject to division, we hold that the evidence is legally insufficient to support the trial court's characterization of the property.  *See Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) ("The trial court has wide discretion in dividing the 'estate of the parties,' but must confine itself to the community property; the only property subject to division.").  And the $60,000 equity in the house that Thurman was awarded in the trial court's final decree represents four-fifths of the property that he was awarded.  Therefore, we must remand this case to the trial court for a determination of the entire community estate and a just and right division of the parties' community property.  *See id.*; *Evans v. Evans*, 14 S.W.3d 343, 347 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding when trial court mistakenly characterizes property constituting main asset of community estate, "error is of such a magnitude that it materially affects the just and right division of the community estate," and appellate court must remand for determination of entire community estate and for just and right division).

We sustain Thurman's third issue.

## Attorney's Fees

In his fifth issue, Thurman argues that the trial court erred in awarding Gwendolyn her attorney's fees because "no expert testimony was offered at trial as to the reasonableness of the fees awarded."

In a lawsuit for dissolution of marriage, a trial court may award "reasonable attorney's fees and expenses." *See* TEX. FAM. CODE ANN. § 6.708(c) (Vernon Supp. 2014); *Phillips v. Phillips*, 296 S.W.3d 656, 670–71 (Tex. App.—El Paso 2009, pet. denied) (noting trial court may apportion attorney's fees in divorce action as part of just and right division of property). Expert testimony as to the reasonableness of the attorney's fees is required to support an award. *Phillips*, 296 S.W.3d at 670–71. The reasonableness of the fee is a question of fact and must be supported by the evidence. *Id.*

The record shows that Gwendolyn's counsel testified regarding his qualifications, that he charges an hourly rate of $300, and that he had "completed many hours" on this case. He explained that the case had been "prolonged" due to having to involve the church in the property ownership issue. And he "believe[d] that [a] fee of $20,000 ha[d] been earned," along with costs and fees, which he did not quantify.

To support an award of attorney's fees, evidence should be presented on the "hours spent on the case, the nature of preparation, complexity of the case,

19

experience of the attorney, and the prevailing hourly rates" in the community. *Hardin v. Hardin*, 161 S.W.3d 14, 24 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Goudeau v. Marquez*, 830 S.W.2d 681, 683–84 (Tex. App.—Houston [1st Dist.] 1992, no pet.) (holding award of attorney's fees required counsel's testimony regarding "his or her employment for the case, the time expended, and what a fair and reasonable attorney's fee would be in a suit of this nature in Harris County, Texas"); *see also In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 387 (Tex. App.— Dallas 2013, no pet.) (noting trial court need not hear evidence on each factor or exact number of hours, but some evidence of reasonableness must be presented).

Here, there is no evidence in the record regarding the time that Gwendolyn's counsel spent on the case, beyond "many hours," and no billing statements or time records were offered. *See Hardin*, 161 S.W.3d at 24; *Marquez*, 830 S.W.2d at 683–84. And counsel did not testify regarding the prevailing hourly rates in the area or the reasonableness of the fees. *See Hardin*, 161 S.W.3d at 24; *Marquez*, 830 S.W.2d 681, 683–84. Again, expert testimony as to the reasonableness of the attorney's fees is required to support an award. *See Phillips*, 296 S.W.3d at 672.

Accordingly, we hold that the evidence is legally insufficient to support the trial court's award of attorney's fees to Gwendolyn.

We sustain Thurman's fifth issue.

## Conclusion

We reverse the portions of the trial court's decree awarding Gwendolyn attorney's fees and dividing the marital property, and we remand for further proceedings consistent with this opinion.  In all other respects, we affirm the trial court's decree.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Huddle.