**Opinion issued December 17, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00010-CV

_____

**MARK THOMPSON, SR., Appellant**

**V.**

**KAREN SMITH, Appellee**

**On Appeal from the 246th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-03434**

## O P I N I O N

Mark Thompson, Sr. appeals an order requiring him to provide indefinite support for his adult daughter, J.L., pursuant to section 154.302 of the Family Code, which permits a court to order one or both parents of a disabled adult child to provide support. TEX. FAM. CODE ANN. § 154.302 (West 2014). He contends that the trial

court abused its discretion in ordering him to provide indefinite support for J.L. because legally and factually insufficient evidence supports (1) the predicate findings that J.L. is disabled and needs substantial care and (2) the statutory factors for determining the amount of support to be paid. We affirm.

## BACKGROUND

In 1992, Thompson and Karen Smith divorced. At that time, J.L. was seven years old. The parties agreed that Smith would receive primary custody of J.L. Thompson provided child support for J.L. and the other children of the marriage under the standard provisions.

In 2013, when J.L. was 28 years old, Smith petitioned the trial court to order Thompson to provide support for J.L. *See* TEX. FAM. CODE ANN. § 154.303(a) (West 2014) (permitting parent of adult disabled child to bring suit for support). At trial, the evidence showed that at birth, J.L. had a congenital defect that caused malformation of her jaw and tongue, and apraxia, a condition caused by brain damage that affects motor skills. In addition, when J.L. was approximately five months old, she suffered an injury; she has been intellectually disabled ever since.

### A. J.L.'s youth

J.L.'s aunt, Lisa Clark, testified that she first noticed J.L. had a disability when she was about two years old because she had trouble eating and walking. J.L. did not begin to speak until she was 18 months old. Her malformed jaw causes her to

2

have trouble eating; food regularly falls out of her mouth. Surgery on her jaw might alleviate some of these problems, but the cost has been prohibitive.

During J.L.'s school years, Clark took care of J.L. from time to time when Smith had to go out of town. Clark confirmed that J.L. required constant supervision and direct assistance with eating, getting dressed, and attending to her personal hygiene.

### 1.    Education

J.L.'s school records show that J.L. began early intervention special education before the age of two. J.L. continued attending the public school district's special education program until her graduation from high school. In the program, J.L. received speech therapy and learned basic reading and mathematics. She participated in the Special Olympics as an extracurricular activity.

Much of J.L.'s school curriculum focused on developing her life management skills, including job skills. During her senior year of high school, J.L. worked at a local restaurant as part of the school's job skills development program. A tutor accompanied her to the restaurant and supervised her while she performed duties as a hostess trainee. J.L.'s participation in the program ended when she graduated from high school.

## *2. School evaluations*

A school evaluation at age 11 showed that J.L. continued to qualify for special education, finding that she was learning disabled and speech handicapped. Testing results indicated that J.L. had an intellectual ability within the borderline to low average range. The evaluation further explained that J.L. showed significant academic or developmental deficits in the area of cognition, and specified that she had mild mental impairment and a speech handicap.

When J.L. was 17 years old, the school district re-evaluated J.L.'s cognitive abilities through a battery of tests. The test results showed that J.L. continued to have significant intellectual deficits. She tested as having an I.Q. of approximately 77, or borderline intellectual disability. Her academic performance was evaluated at a grade equivalent of 4.8. J.L.'s developmental performance thus was evaluated as equivalent to that of a 10-year-old. J.L. showed deficits in short-term memory and auditory processing. The evaluation also notes that J.L. lacked appropriate social skills.

The assessment of her speech ability concluded that at age 17, after years of speech therapy that began before age 2, J.L. appeared to have maximized her potential in the area of articulation; although she had been working on her articulation skills since before the age of four, she still was unable to produce all of

4

the sounds necessary to be completely intelligible. J.L.'s speech continues to be difficult to understand.

### 3.    *Mental health issues*

J.L. began to exhibit mental and emotional problems in eighth grade. She has a diagnosis of manic-depressive (bipolar) disorder with psychosis and intellectual disability.[1]

### B.    J.L.'s adulthood

J.L. cannot retain information on a day-to-day basis, which prevents her from doing some things and impairs her ability to do others without support. J.L. needs supervision and assistance in dressing, brushing her teeth, brushing her hair, applying deodorant, taking her medication, and otherwise maintaining her personal hygiene. Smith testified that J.L. has to be told when to take a shower, and she regularly forgets to rinse the shampoo out of her hair. After the shower, Smith has to remind J.L. to put on clean clothes or she will put on her dirty clothes again.

---

[1]    The record refers to this part of J.L.'s diagnosis as "MR," referring to "mental retardation." Recent revisions to the diagnostic manual for mental disorders replace "mental retardation" with "intellectual disability" as the current preferred term. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM–5), § 2 (May 2013).

J.L. continues to be clumsy and frequently spills things around the house. She requires supervision and assistance with household chores, which she performs only as well as a 10- or 11-year-old would.

J.L. has not been able to obtain a driver's license; she failed the test three times. Further, J.L. cannot safely prepare her meals without supervision. Once, she destroyed a microwave oven when she turned it on with a metal spoon inside. On another occasion, J.L. started a grease fire on the stove when she was trying to cook for herself.

J.L. receives ongoing psychiatric treatment but remains emotionally unstable. She can shift very quickly between extreme highs and lows, and she has difficulty controlling herself when she becomes upset. She has a history of self-injury and tried to commit suicide four times in the period from January 2013 to August 2014. When she is depressed, J.L. becomes angry and physically aggressive, and she may scream and cry hysterically. J.L. has damaged walls in the home during fits of anger. J.L. admitted that when she gets upset, she throws things or yells or cries, but testified that her medicine is helping her control those behaviors. She further testified that she does not stay by herself because "if I'm alone too much, I have emotional problems. And I have a nervous breakdown." J.L.'s outbursts are unpredictable and can occur multiple times in a week.

Clark described J.L.'s mood shifts as extreme: when she is happy, she behaves "[a]lmost like an eight-year-old." She is "very silly," and "giggles just like a child." When J.L. is sad, "she becomes very sullen" and "tends to be very physical. If you try to talk to her, she'll hit towards you. She has cut herself." Clark confirmed that J.L. has behaved that way since before she was 18.

Smith testified that J.L. does not observe safe personal boundaries. Smith tries to keep J.L. from answering the front door or the telephone because she does not understand the need for privacy or security. For example, Smith noted, J.L. will open the door to strangers and will volunteer the home address and security code to anyone who calls.

J.L.'s brother Mark recounted that J.L. lived with him for about six months of the prior year. He testified that J.L. "couldn't be left home alone" and that he had to make sure that someone was home to watch her. As an example, Mark described an instance in which J.L. got up in the morning before Mark was awake and set the kitchen on fire when she tried to make breakfast for herself. Mark confirmed that J.L. needed to be reminded every morning to get up, take a shower, brush her teeth, and put away her bedding, and in the evening to take a shower, eat, and take her medication. He also attested to J.L.'s extreme mood swings. At times, Mark explained, J.L. "did not seem to know where she was," and could go "out of control," screaming, yelling, and becoming physically combative.

Both J.L.'s brother and aunt testified that J.L. would not be able to hold down a job, explaining that she would not be able to keep herself clean and presentable, commute to and from a job, or keep her emotions and behavior in check while working. J.L. applied for job referrals from the Texas Rehabilitation Commission after her high school graduation, but did not receive any interviews. When J.L. was 30 years old, she applied for and received Supplemental Security Income (SSI) disability benefits. She continues to qualify for those benefits. J.L. also qualifies for support services from a local community mental health center.

In response to Smith's evidence, Thompson testified that he did not believe J.L. was incapable of self-support or that she required substantial care or supervision. Thompson admitted, however, that J.L. required some supervision and had to be told "to do things." Thompson also admitted that he had not spent any significant amount of time with J.L. since the 1992 divorce and, as a result, he did not have much personal knowledge of, or experience with, J.L.'s needs.

## DISCUSSION

### I. Standard of Review

Most of the appealable issues in a family law case, including child support, are evaluated against an abuse-of-discretion standard. *Reddick v. Reddick*, 450 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (applying standard to review child support award). To

8

determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion, and (2) erred in its application of that discretion. *Reddick*, 450 S.W.3d at 187. We conduct the applicable evidentiary sufficiency review when considering the first prong of the test. *Id.* We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.*

In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict. *HTS Servs., Inc. v. Hallwood Realty Partners*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist] 2005, no pet.). When challenged, findings of fact are not conclusive where, as here, there is a complete reporter's record. *Id.* Under these circumstances, the trial court's findings of fact are binding if the evidence supports them. *Id.* If the findings are challenged, we review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007,

no pet.). We consider the evidence in the light most favorable to the finding under review, and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822.

In reviewing for factual sufficiency, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *HTS Servs.*, 190 S.W.3d at 111; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("It is a familiar principle that in conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the [factfinder]."); *Figueroa v. Davis*, 318 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (observing that factfinder may choose to believe one witness over another).

## II.    Support for a Disabled Adult Child

The trial court entered the challenged award pursuant to Chapter 154 of the Family Code. Chapter 154 provides an independent cause of action to seek support from one or both parents for an adult child who "requires substantial care and personal supervision because of a mental or physical disability." TEX. FAM. CODE ANN. § 154.302. To award support under this provision, the court must find that:

10

(1)    the child, whether institutionalized or not, requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support; and

(2)    the disability exists, or the cause of the disability is known to exist, on or before the 18th birthday of the child.

*Id.* § 154.302(a).

## A.    Entitlement to support

### 1.    *Disability*

Thompson contends that the evidence is neither legally nor factually sufficient to support a finding that J.L. is disabled. With respect to Thompson's legal sufficiency challenge, testimony from Smith, J.L.'s aunt, Lisa Clark, and J.L.'s brother, Mark Thompson, Jr., all corroborate J.L.'s motor and intellectual impairments as well as her significant mental and emotional impairments. Their testimony demonstrates that J.L., even with medication, has severe and unpredictable mood swings; is unguarded with strangers; engages in physical altercations and destructive behavior when angry; and lacks the ability to independently perform basic activities such as bathing, dressing herself, and preparing meals.

The evidence that J.L. has been unable to obtain employment and that she qualifies for SSI benefits also supports the trial court's disability finding. SSI claimants must prove that they are disabled within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). The Act defines "disability"

as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A), *quoted in Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001).

To counter this evidence of disability, Thompson points to evidence that J.L.

- is competent to testify in court, eligible to vote, and has sufficient intelligence and capability to execute a power of attorney;

- can dress herself, does not need special equipment, and is able to communicate with others;

- is able to read, write, perform basic math, and has a high school diploma; and

- can use a computer and a telephone.

These abilities, however, do not render the trial court's disability finding against the great weight and preponderance of the evidence. For instance, the standard for competency to testify does not correspond to the factors used to determine whether an adult child is disabled under the Family Code. *Compare* TEX. R. EVID. 601 (providing that every witness is competent to be a witness unless the rules provide otherwise, and identifying as incompetent "[a] person who is now insane or was insane at the time of the events about which the person is called to testify," and (2) "[a] child—or any other person—whom the court examines and finds lacks sufficient intellect to testify concerning the matters in issue") *with* TEX.

FAM. CODE ANN. § 154.302(a) (providing that adult child is disabled when child requires substantial care and personal supervision because of mental or physical disability and will not be capable of self-support). Further, the record does not demonstrate that J.L.'s competency to vote or to execute a power of attorney was adjudicated.

With respect to J.L.'s education, Thompson fails to account for the fact that J.L. acquired a special education diploma, and that, according to the record, her reading and math skills are closer to an elementary grade skill level than the level expected of a non-disabled high school graduate. Thompson wholly neglects J.L.'s speech difficulties, as well as her additional diagnoses of bipolar disorder and psychosis, which cause J.L. to have inappropriate and volatile behavior as a result of her mental and emotional instability. Because the trial court had legally and factually sufficient evidence of the significant nature of J.L.'s disabilities before it, it did not abuse its discretion in finding that J.L. is disabled and incapable of self-support. *See* TEX. FAM. CODE ANN. § 154.302(a)(1).

## 2. *Substantial care*

Thompson also challenges the legal and factual sufficiency of the trial court's finding that J.L. requires substantial care and personal supervision because of her disability. Thompson, however, does not point to any affirmative evidence in the record supporting his contention that J.L. can live, or ever has lived, independently. All three of her family caretakers—two of whom had cared for J.L. during the year immediately preceding trial—consistently testified that J.L. is unable to independently perform daily routines and requires supervision to perform basic tasks, including bathing herself and preparing food.[2] J.L., as well as her caretakers, testified that she cannot safely be left alone, citing instances when she had dangerous accidents and emotional problems as a result. J.L.'s history of self-harm and suicide attempts also support the trial court's finding that J.L. requires substantial care. All of this evidence, which is uncontroverted, is legally and factually sufficient to allow the trial court's exercise of discretion in determining that J.L. satisfies the predicate requirements for an award of support as an adult disabled child.

---

[2] The record contains disputed evidence concerning J.L.'s ability to dress herself. J.L. testified that she can dress herself without assistance, but then admitted that her mother applied deodorant "because she thinks that I don't put it on her way." Smith, on the other hand, testified that J.L. regularly needed to be reminded to put on clean clothes, and J.L.'s brother testified that he had to remind J.L. to take care of personal hygiene and other daily tasks, such as taking her medication and eating. We may not disturb the trial court's credibility determination on this disputed record. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

14

## B.    Determination of support obligation

Thompson next contends that the trial court erred in awarding support because the evidence is legally and factually insufficient to support the statutory factors for determining the amount of support he must pay.  Family Code section 154.306 provides:

> In determining the amount of support to be paid after a child's 18th birthday, the specific terms and conditions of that support, and the rights and duties of both parents with respect to the support of the child, the court shall determine and give special consideration to:
>
> (1)    any existing or future needs of the adult child directly related to the adult child's mental or physical disability and the substantial care and personal supervision directly required by or related to that disability;
>
> (2)    whether the parent pays for or will pay for the care or supervision of the adult child or provides or will provide substantial care or personal supervision of the adult child;
>
> (3)    the financial resources available to both parents for the support, care, and supervision of the adult child; and
>
> (4)    any other financial resources or other resources or programs available for the support, care, and supervision of the adult child.

TEX. FAM. CODE ANN. §154.306 (West 2014).  The record contains evidence of (1) the household income and expenses for Smith, her husband, and J.L.; (2) J.L.'s medical records; (3) the Social Security Administration's letter confirming J.L.'s monthly SSI payment; (4) J.L.'s unpaid medical bills; (5) J.L.'s cell phone expenses; and (6) Thompson's pay stubs.  Smith testified that J.L. was receiving psychiatric

15

care on an ongoing basis and that she was currently enrolled in Medicaid, but asked for Thompson to provide health insurance coverage for J.L. in the event the Medicaid benefits were terminated. Smith also testified that she did not work outside the home and that Smith provides J.L. with the supervision she needs or makes arrangements with close friends or family members to care for J.L. when Smith goes out of town. The record also contains evidence of other financial resources, through Medicaid and SSI, available to J.L.

Thompson asserts that J.L.'s general living expenses did not satisfy the statutory requirement that they meet a need stemming directly from her alleged disability. We disagree. The record shows that J.L.'s disabilities render her unable to work. She would not have qualified for SSI disability benefits if she had another source of significant financial support. She cannot independently meet her own daily living and health care expenses and requires substantial care and personal supervision. Smith provides J.L. with substantial care and personal supervision in her own home; Thompson was not asked to pay for J.L. to receive care from a third party, such as a supervised living community or adult day care. The record shows that Smith meets J.L.'s needs for support, care, and supervision, under circumstances that have remained more or less consistent since before J.L. turned 18. This evidence supports a reasonable inference that Smith will continue to care for J.L. into the indefinite future.

Thompson also complains that Smith did not disclose all of the financial resources available to her that would be available to support J.L. Thompson concedes that Smith provided an estimate of her current husband's net monthly income, and the record shows that Smith lives at home with J.L. Thompson nevertheless suggests that some income information was not before the court, pointing to Smith's testimony that her current husband had supported J.L. until she was 18 years old and thereafter refused to do so.

Smith's husband, however, had no legal obligation to support J.L. The trial court could calculate Smith's half of the community property—as well as account for Smith's actual provision of care to J.L. pursuant to section 154.306(2)—based on the evidence of household income and expenses before it. Accordingly, we conclude that the trial court had sufficient evidence before it to consider the section 154.306 factors in exercising its discretion to impose the support obligation on Thompson.

## CONCLUSION

We hold that legally and factually sufficient evidence supports the trial court's findings that J.L. is disabled to an extent that she requires substantial care and supervision; accordingly, the trial court acted within its discretion in ordering a continuing support obligation to meet J.L.'s needs. We therefore affirm the judgment of the trial court.

                                    Jane Bland
                                    Justice

Panel consists of Justices Jennings, Keyes, and Bland.