# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00426-CV

**Nicholas Field, Appellant**

**v.**

**Brandi Pinsker, Appellee**

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-08-001038, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## O P I N I O N

Appellant Nicholas Field appeals from the district court's order modifying its prior order of child support. In two issues on appeal, Field asserts that the district court abused its discretion in modifying his child support obligations to his autistic adult son E.N.F. ("Eric")[1] because the evidence is insufficient to show that (1) Field's income and Eric's proven needs justified support in excess of the presumptive guideline amount; and (2) the amount above the guidelines was justified under Texas Family Code Section 154.306, the provision relating to child support after the child turns eighteen. *See* Tex. Fam. Code § 154.306. We will affirm the district court's order.

---

[1] We refer to Eric using a pseudonym to protect his privacy. *See* Tex. Fam. Code § 109.002(d).

## BACKGROUND

Field and appellee Brandi Pinsker married in 2001 and divorced in 2008. At the time of their divorce, they both lived in Austin, but both later moved to Cedar Park. In 2022, Pinsker moved back to Austin. During their marriage, they had one child, Eric, who was born in 2004. In their divorce decree, the parties agreed to equal possession of Eric and that each party would pay a certain percentage of various expenses for Eric, with Field paying 100% of Eric's "[t]uition, books, fees, and related expenses for enrollment in pre-school, day-care or after-school/extended care, summer childcare and daycamps, and summer camps; provided such enrollment is agreed upon in advance by the parties."

In 2022, Pinsker filed a petition to modify the parent-child relationship. In the petition, Pinsker alleged the following:

> [Eric] will attain the age of eighteen years on May 26, 2022. [Eric] will be an adult child who requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support. The disability existed or its cause was known to exist before or on [Eric's] eighteenth birthday. The circumstances of the child or a person affected by the order have materially and substantially changed since the date of the signing of the settlement agreement on which the order to be modified is based and it has been over 3 years since the order to be modified was rendered. The Court is requested to order that child support be ordered to be paid by NICHOLAS J. FIELD directly to BRANDI PINSKER as Trustee of a special needs trust for the benefit of [Eric] and that child support and medical support for the support of this child be continued after the child's eighteenth birthday and extended for an indefinite period.

The case proceeded to a hearing on the motion to modify in March 2024 at which Pinsker and Field each testified.[2] Field testified that Eric had been diagnosed with Level 3 autism, the most severe form of autism, when he was approximately two years old. When Eric

---

[2] The only other witness to testify at the hearing was Pinsker's attorney, who provided testimony regarding his attorney's fees.

was a teenager, he was further diagnosed with an intellectual development disability and an auditory processing disorder, and later with depression and emotional dysregulation.

Pinsker testified that Eric has had "a speech delay his whole life," with "limited functional language." His social skills were "nonexistent"—Eric "has never had a friend," "wanted a friend," or understood "why you would need a friend." "[H]e also has zero empathy." Pinsker explained,

> I mean, his lack of empathy is unlike anything I've ever seen in my life, you know. I've been with [Eric] for almost 20 years now, and I am his every-day person. We are his resource in life.

> And he doesn't want to go hiking, and he told me that he wanted to slam the door on my legs and break my legs so that we don't have to go hiking. And he doesn't understand why that's mean, why that's hurtful, and that you shouldn't talk that way to people that you love, or anyone really. And so he just – you know, he just has zero social skills.

Eric also suffers from "really high anxiety" that "looks different in [Eric] than it looks like in other kids." She elaborated, "It's not like mental anxiety where you're worried about something. It's more physical anxiety, and so he's pacing, and he's biting his finger," and "he's nonfunctional in that sense, because his anxiety is so high, and all he can do is pace and hum and, you know, sort of flap his hands sometimes."

Pinsker recounted that "there are three versions" of Eric, and "we never know what we're going to get." The first version "is this really high-anxiety kid . . . he's pacing and humming, and you can't get in there, and you can't get any language out of him, and you can't get, you know, really any level of compliance out of him." This version of Eric could last for four to five hours a day.

3

The second version is "behavior" Eric, "where he almost looks like someone who's drunk and just looking to get in trouble.  You know, he's picking on Jeff [Pinsker's husband] and trying to touch him inappropriately, grabbing his phone and throwing it in the toilet or just, you know, looking for ways to get in trouble and to get under our skin."  This version of Eric engaged in anti-social and destructive behavior, including shattering a bathroom toilet, "mess[ing] with" and threatening his younger half-sister (the daughter of Field and his wife), throwing a brick through a classroom window, trying to stab Field's wife Victoria, throwing a typewriter over a second-story landing, exposing himself to others, wiping his fecal matter on walls, trying to set a video-game console on fire on a stovetop, hitting people in school, setting off a fire alarm, and flipping over a desk in a classroom.  Eric's behavior was so bad that it got him kicked of a school that specializes in children with similar needs, even though Pinsker had served on that school board for ten years "to help keep them alive and healthy and going.  I mean, I had a deep connection to the school, and there was nothing we could do."

The third version of Eric "is this really amazing kid. And he is lucid, and he is conversational, and he is funny."  Pinsker recalled,

> And he loves to talk about travel.  He loves maps.  He loves cooking videos and cooking with us.  Yeah.  I mean, and if you get lucky, and you get—everything lines up, there's a great kid in there, but, you know, it's sort of like Whac-A-Mole trying to get there, because we're—you know, we're working with behavior therapists and medicine to try to control all of this.  And, you know, in the middle of this is this 19-year-old hormonal kid who's also changing every day.

Additionally, Eric "had a lot of violent issues."  On one occasion, he went to lunch with his grandmother, "and on his way back from the bathroom, he grabbed a fire extinguisher and hit a six-year-old girl in the head with it."  Although the girl was "fine," "[t]he

4

cops were called. Ambulances were called," and Eric's grandmother was traumatized by the incident. Moreover, this was not the first time Eric had hit someone with a fire extinguisher. Field testified that it had happened at Eric's school two weeks earlier. As a result of Eric's increasingly violent behavior, Pinsker has had difficulty finding caregivers for him, even on a temporary basis. Pinsker used to have "a larger roster of care providers," but now had only her adult nephew, who is paid $30 per hour to watch Eric, and one of Eric's former special education teachers, who charges Pinsker $35 per hour to care for Eric.

Pinsker believes that now that Eric is an adult, his size and age make it increasingly likely that his violent behavior will result in injury to himself or others or that criminal charges might be filed against him. Regarding the incident with the six-year-old girl, Pinsker recounted, "And he's an adult. He could go to jail now. I mean, the cops were called, and we were beyond lucky that the family didn't sue us, and that the cops didn't press charges and take him to jail."

Field largely agreed with Pinsker's characterization of Eric's behavioral incidents. He testified that Eric has "had some very difficult issues" and that "there's just a ton of behavior that is going on everywhere." Because of his behavior, Eric requires constant, one-on-one care, and Pinsker testified that there are limited resources available to provide that care. Eric needs help in the morning getting out of bed, getting in the bath, and someone "reminding him to wash his hair and to wash his body and put on deodorant and brush his teeth." Additionally, Eric "needs a very structured, very engaging day, because if he gets bored, he gets behavior."

Eric's need for constant care made it difficult for Pinsker and Field to care for him while working. Pinsker and her husband Jeff own a company called Project Genius that makes "educational brain teasers and toys." The company partners with Greenleaf, a nonprofit

5

organization in Austin that provides vocational training and job opportunities for adults with autism. Pinsker hoped that Eric could work for the company at some point, although right now he has "too much behavior" to work for Greenleaf. Pinsker explained that because of the demands of her business, providing care for Eric was becoming increasingly difficult for her. At the time of trial, she was able to work only 30 hours per week because of Eric's schedule, but she "needs to be able to work full time." Pinsker also did not believe that Field had the ability to both work and care for Eric.

Pinsker testified that "we need a consistent well-paid, well-qualified care provider so that everybody can go to work and know that [Eric] is okay too." She opined, "I mean, I certainly could maybe hire someone to keep [Eric] on his iPad all day and keep him safe. Maybe he could just go hang out at [Field's] house and be on his iPad, but that's not in [Eric's] best interest." Pinsker added that Eric "is on a second-grade reading level, has a significant speech delay, and a lot of behavior issues. He doesn't need less intervention. He needs more intervention."

Field testified that he and his wife Victoria work from home; Victoria was a "full-time remote employee," while Field was "an 80 percent work-at-home employee. I do have in-office days one day a week, but otherwise we're always at home." Field agreed that Eric needed continual care and that, like Pinsker, he could not work full time while being the primary care person for Eric.

Pinsker testified that Field had not had an overnight period of possession with Eric from either 2018 or 2019 until June or July 2022, after her modification petition had been filed. Pinsker and Field had agreed on this arrangement for the safety of Eric's baby sister. Pinsker recalled that Eric "just gradually started spending more time with us because he didn't

6

want to be at [Field's] house with the baby there. Babies have always bothered [Eric]," and "he has always been bothered by babies crying and the pitch of little girls' voices." Additionally, Eric "was being so dangerous around [the baby] and wanting to hurt her." As a result, Field told Pinsker "that they weren't comfortable having [Eric] at their house around [the baby], and they definitely weren't comfortable having him there overnight, and that he didn't feel like they could have him over there anymore, and that he needed to stay with us until things got better."

Pinsker testified that for most of Eric's life, she and Field were "poster-child-collaborative parents" and were both "always making decisions that put [Eric] first." She added, "I'm not saying we've never—but it has—or, you know, had a couple of rough patches, but for the most part, we always put [Eric] first and we got along really well." Pinsker also testified that Eric's life had been enhanced by both of their remarriages: "I mean, listen, [Eric] had two parents, and now he has four. And if there's anyone on this planet that needs four parents, it's [Eric]. Yeah, it's nice to have the help."

However, by 2022, the co-parenting relationship between Pinsker and Field had deteriorated to the point where Pinsker felt compelled to file this modification suit. Before then, Pinsker had "start[ed] to ask [Field] to contribute more either time-wise or money-wise," and they "started to butt heads then." However, Pinsker had wanted to stay out of court so that Eric could have stability in his life. The "turning point" for Pinsker came when she "was asking for [Field's] help getting [Eric] to a dentist appointment, and we got into a fight about it. And he finally told me that he was going to call CPS so that [Eric] couldn't be at his house anymore." Pinsker considered this an "unacceptable" threat to Eric's well-being and told Field that they "would work through attorneys from there." She testified, "You know, to that, I feel like [Field] doesn't have his best interest at heart anymore, and he's not—you know, if he would do that to

7

[Eric], he's not looking out for [Eric] anymore." Pinsker also began to realize, as Eric approached adulthood, that she would need to care for him for the remainder of her life and that she would need more financial assistance moving forward.

Field acknowledged that in 2022, he had refused to communicate with Pinsker on one occasion when she tried to talk to him about a plan for Eric's care that summer, and he did not pay for Eric's care as provided in the divorce decree, instead placing the money in a savings account. Pinsker testified that Field "got mad that I wouldn't share a medical bill with him and stopped paying child support." Field had agreed to care for Eric for one week in summer 2022 when Pinsker and her husband went out of town for vacation, and Pinsker testified that "it was great" and that Field and Eric "had a successful week" together.

Field testified that in 2023, he had possession of Eric on the first, third, and fifth weekends of the month and sometimes when Pinsker traveled to trade shows for work. He also had him "for the majority of the winter break." However, Pinsker testified that during that summer, Field had backed out of an arrangement that they had made for Field to take care of Eric during the week. After that, Pinsker decided to go back "to strictly the orders that the Court had given us" because "when we're not getting along, it's the easiest thing to do." As a result, Eric "was with me at my office all day. Sometimes I had help. Sometimes I didn't. Mostly I didn't."

The parents had participated in applied behavioral analysis ("ABA") therapy for Eric, which stopped in May 2022 after Pinsker filed suit. In August 2022, the district court ordered Field to resume ABA therapy as part of its temporary orders. Field did not secure that therapy until January 2023, and it lasted for one week, after which "the therapist ended it." Field did not set up ABA therapy again until January 2024, approximately two-and-a-half months

before the final hearing. Pinsker testified, "And in his defense, listen, I think it's really hard to set up ABA. There aren't a lot of people who take adults, and there aren't a lot of people who will deal with the level of behavior that [Eric] has." Field testified, "It's almost impossible. Most ABA therapists stop between the ages of eight and ten. Finding ABA therapists that go beyond that is rare." At the time of trial, insurance had approved Eric for 25 hours per week of ABA therapy, but he was only receiving 10 to 12 hours per week. Most of the therapy was at Field's house, which Pinsker testified was difficult on Eric. She explained,

> And so he's got therapy set up Monday, Tuesday, Thursday, and Friday starting at 8:00 at [Field's] house, which means that he either has to come over the night before and pick [Eric] up at 8:30, or we meet at Barnes & Noble, which is halfway, at 7:30 in the morning.
>
> I think that's a really hard schedule on [Eric]. It's a big change in where he stays. He's not used to being at [Field's] house that much. I don't feel great about yanking him out of bed at 6:30 in the morning or, you know, trying to ferry him back and forth that much.

Field acknowledged, "It's a lot of driving. I mean, it's very difficult. It works out to be, you know, eight to ten hours of commuting just for [Eric] every week minimum." Pinsker was "on the fence" about whether ABA therapy was helpful, while Field testified that he had seen "dramatic improvement" in Eric's behavior following ABA therapy sessions. Pinsker further believed that ABA therapy was not a good long-term solution because "everybody ages out of ABA, and insurance will eventually stop approving it." Field disagreed with that, testifying that "[t]hey will do ABA for people who are autistic or not autistic at any age" and that he was "not aware of any age cutoff with the insurance company."

9

Pinsker testified that Field has "been great" with ABA therapy and had not canceled any sessions. Pinsker had canceled a couple of sessions "[b]ecause [Eric] has sleep issues, and if [Eric] doesn't go to sleep the night before, I can't justify getting him up at 6:30 to take him up to Barnes & Noble for ABA, because he has to sleep." She added, "I mean, sometimes [Eric] stays up all night. Sometimes he doesn't go to bed until 3:00 o'clock in the morning, 5:00 o'clock in the morning. If he goes to bed at 5:00, I have to let him sleep in the next day. "

At the time of trial, Eric was attending school at Austin's Rosedale School for children with severe special needs. He would no longer be able to attend that public school in summer 2026. Both Pinsker and Field agreed that at that time, Eric's needs would change. They were both looking into other care options for Eric without success. It was difficult to find summer camps that would take Eric because of his special needs; Rosedale had an extended school year option during the summer that provided only three hours of care per day; and because of his behavior, Eric could not work for Greenleaf, attend cooking class at the University of Texas, or attend camp at a place called Mindworks, all of which Pinsker had considered as options for Eric.

Pinsker and Field had also been working on obtaining Social Security benefits for Eric. In September 2022, Field had applied for Social Security for Eric but had been denied. In August 2023, Pinsker hired a specialist "to walk us through the process and help us get through it," and she believed that Eric would ultimately get approved, resulting in an additional $800 per month.

Field presented evidence that he earned $17,204.72 per month in gross income, $9,760.60 per month in net income, and $12,892.62 per month in statutory net resources.

10

Pinsker had $22,652.08 per month in gross income, $15,767.55 per month in net income, and $15,679.08 per month in statutory net resources.

Pinsker prepared monthly budgets estimating Eric's financial needs through May 2026 and then from June 2026 onward, apportioning portions of various household and other expenses to Eric. The budgets reflected that Eric's total needs would be $7,387.00 per month through May 2026 and would increase to $11,114.00 per month once Eric could no longer attend Rosedale in June 2026. The budgets included estimates for Eric's activities, including summer camps and the cost of caregivers during those activities. Pinsker's biggest budgeted expense for Eric was childcare, which she estimated would be $1,811.00 per month for care during the summer and $1,700 per month for care during the school year, through May 2026. Beginning in June 2026, Pinsker estimated that Eric's monthly care expenses would increase to $7,245.00 per month.

Pinsker also prepared a worksheet calculating the allocation of Eric's needs between the parents based on their monthly net resources. Field's net resources, minus his presumptive child support of approximately $1,610 per month, amounted to approximately 41.35% of their total resources while Pinsker's net resources amounted to approximately 58.65% of their total resources.

When asked what he wanted the district court to order him to pay for child support, Field testified, "I would like to continue to pay the ABA, 50 percent of medical. And then otherwise for child care, I think the number is just too high. I suggest—I would propose that I take care of [Eric] Monday through Friday and eliminate that need for child care." He added that he did not think he should be ordered to pay any periodic child support.

11

At the conclusion of the hearing, the district court took the matter under advisement and later issued its modification order. Among other modifications not challenged in this appeal, the order required Field to pay child support in the amount of $2,211.23 per month beginning May 1, 2024, and $5,206.62 per month beginning June 1, 2026. These amounts were above the amount of guideline support of $1,610.00 per month. Upon Field's request, the district court made findings of fact and conclusions of law, which we discuss in detail below. This appeal followed.

**STANDARD OF REVIEW**

We review trial court decisions about child support for abuse of discretion. *See Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *Udall v. Minns*, 730 S.W.3d 704, 726 (Tex. App.—Austin 2026, pet. denied). A trial court has discretion to set child support within the parameters provided by the Texas Family Code. *Iliff*, 339 S.W.3d at 78 (citing *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 415 (Tex. 1993)); *see also* Tex. Fam. Code §§ 154.121-.123. "A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam) (citation omitted). "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Worford*, 801 S.W.2d at 109 (per curiam)).

In family-law cases, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *See Zeifman v. Michels*, 212 S.W.3d 582, 587-88 (Tex. App.—Austin 2006, pet. denied). Consequently, legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether

the trial court abused its discretion. *Id.* at 587. To determine whether the trial court has abused its discretion, we engage in a two-pronged inquiry, analyzing whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) the trial court erred in its application of that discretion. *Id.* at 588.

Traditional standards for legal and factual sufficiency come into play with the first question. *Id.* When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). When conducting a factual-sufficiency review, we consider all the record evidence and set aside the trial court's order only if the evidence is so weak as to make the order clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We defer to the factfinder's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Because the trial court acts as the factfinder in a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

The trial court does not abuse its discretion if it bases its decision on conflicting evidence or when some evidence of a probative or substantive character exists to support its decision. *Zeifman*, 212 S.W.3d at 587. However, a trial court has no discretion to incorrectly analyze or apply the law, and its failure to analyze or apply the law correctly is an abuse of discretion. *See Iliff*, 339 S.W.3d at 78; *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

**DISCUSSION**

**Support amount above the presumptive guideline amount**

In his first issue, Field asserts that the evidence is insufficient to establish that his income and Eric's proven needs justified support above the presumptive guideline amount of $1,610.00 per month. Specifically, he argues that Pinsker provided contradictory testimony about the costs and hours of providing childcare to Eric, that not all the expenses on Pinsker's budget are directly related to Eric's disability or qualify as "unmet needs," that Pinsker's "actual evidence of past and future expenses was wholly speculative," and that Field earns less money than Pinsker and already incurs expenses for Eric's care.

The amount of child support ordered depends on whether an obligor has net monthly resources above or below a certain threshold, currently $9,200.00. *See* Tex. Fam. Code § 154.125(a); *see also* Office of the Att'y Gen., Announcement of Adjustment Required by Texas Family Code § 154.125, 44 Tex. Reg. 3559, 3559 (2019) ("Effective September 1, 2019, the guidelines for the support of a child apply to situations in which the obligor's monthly net resources are not greater than $9,200.00."). If the obligor's monthly net resources exceed $9,200, the court "shall presumptively apply" the guidelines based on the monthly net resources of the obligor but "may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the child." Tex. Fam. Code § 154.126(a); *Zorilla v. Wahid*, 83 S.W.3d 247, 253 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.). Thus, the Family Code grants the trial court discretion to order additional amounts over and above the statutory guideline amount based on the child's proven needs. *See* Tex. Fam. Code § 154.126(b) ("[I]n no event may the obligor be required to pay more child support than the greater of the presumptive amount or the amount equal to 100 percent of the proven needs to the

14

child."); *see also In re K.F.*, No. 02-18-00187-CV, 2018 WL 6816119, at *4 (Tex. App.—Fort Worth Dec. 27, 2018, pet. denied) (mem. op.) ("[P]rior to awarding more than the guideline amount, the trial court must first determine the proven needs of the child.").

"To impose child support beyond the [statutory] guidelines, the record must contain evidence of the 'proven needs' of the child." *In re M.A.M.*, 346 S.W.3d 10, 17 (Tex. App.—Dallas 2011, pet. denied). Although the needs of the child are not limited to the "bare necessities of life," the trial court should not consider "the parents' ability to pay or the lifestyle of the family." *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993). Rather, "in determining the needs of the child," courts should "continue to follow the paramount guiding principle: the best interest of the child." *Id.*; *see Reagins v. Walker*, 524 S.W.3d 757, 761 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The best interest of the child should remain the trial court's primary consideration in deciding whether to modify a support obligation.").

Field was ordered to pay $2,211.23 per month in child support beginning May 1, 2024, and $5,206.62 per month beginning June 1, 2026. He does not dispute that he owes $1,610.00 per month, the base amount of guideline support. Instead, he challenges the sufficiency of the evidence to support the additional amounts of child support that he was ordered to pay above the base amount.

Field's statutory net resources are $12,892.62 per month. Because this amount is above the current statutory threshold of $9,200, the district court was authorized to order Field to pay an additional amount of child support "as appropriate, depending on the income of the parties and the proven needs of the child." *See* Tex. Fam. Code § 154.126(a). Regarding Eric's proven needs, the district court found the following:

15

The Child's current proven monthly needs, over and above the guideline support of $1,610.00 per month and excluding medical and mental health expenses and ABA therapy expenses, total $1,454.00 per month. In addition to support of $1,610.00 per month, Respondent should pay 41.35% of said $1,454.00, or an additional $601.23, each month to Petitioner.

The Child's proven monthly needs beginning June 1, 2026, and thereafter, over and above the guideline support of $1,610.00 per month and excluding medical and mental health expenses and ABA therapy expenses, total $8,698.00 per month. Beginning June 1, 2026, in addition to support of $1,610.00 per month, Respondent should pay 41.35% of paid $8,698.00, or an additional $3,596.62, each month to Petitioner.

Thus, the district court found that Eric's proven monthly needs were $3,064.00 ($1,610.00 + $1,454.00) through May 2026 and $10,308.00 ($1,610.00 + $8,698.00) beginning in June 2026. The record contains evidence of a substantive and probative character to support these amounts. Pinsker provided evidence from which the district court could find that her expenses involving Eric through May 2026 exceeded $3,064.00 per month, including $1,361 per month for Eric's portion of household expenses, $730 per month for his portion of food and groceries, $150 per month for clothing, $197 per month for transportation, $906 in miscellaneous expenses (including entertainment, personal care, gifts, and travel), $1,811.00 in summer childcare expenses, and $1,706.00 in childcare during the school year. Similarly, Pinsker provided evidence that her expenses involving Eric beginning in June 2026 exceeded $10,308.00 per month. Pinsker's budgeted expenses for most of the above items remained the same, but her childcare expenses increased significantly to $7,245.00 per month for full-time care once Eric could no longer attend school. Pinsker testified that her cost of care was calculated by multiplying $35 per hour, which was the amount that Eric's former teacher charged to care for him, by 50 hours per week, which was the amount of hours of care that Eric needed when he was not in school. These are the types of expenses that trial courts in their discretion may consider

16

when ordering additional child support, and we cannot conclude on this record that the district court abused its discretion in doing so. *See Coburn v. Moreland*, 433 S.W.3d 809, 836 (Tex. App.—Austin 2014, no pet.); *Scott v. Younts*, 926 S.W.2d 415, 422 (Tex. App.—Corpus Christi-Edinburg 1996, pet. denied); *see also Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *1 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.); *In re L.J.M.*, No. 13–13–00367–CV, 2014 WL 3053209, at *4 (Tex. App.—Corpus Christi-Edinburg July 3, 2014, no pet.) (mem. op.).

Field's arguments to the contrary are unavailing. To the extent that there was conflicting evidence regarding the time that Pinsker and Field each spent providing childcare to Eric, and the costs of such care, those conflicts were for the district court as factfinder to resolve. *See City of Keller*, 168 S.W.3d at 822. To the extent that some of the items on Pinsker's budget worksheets may not have been for Eric's unmet needs, the evidence summarized above supports the district court's finding that at least $1,454.00 per month through May 2026 and at least $8,698.00 per month beginning in June 2026 were for Eric's unmet needs, as Section 154.026 requires (subtracting from Eric's total needs the $1,610.00 per month of guideline support already owed). Pinsker's evidence regarding her expenses was not "wholly speculative," as she provided testimony regarding the historical costs of providing care to Eric and budget worksheets detailing the other expenses. *See Yarbrough v. Yarbrough*, 151 S.W.3d 687, 693 (Tex. App.—Waco 2004, no pet.). And contrary to Field's assertion, the record reflects that the district court accounted for the fact that Pinsker earns more money than Field, as it allocated approximately 41.35% of Eric's additional proven needs to Field and a larger percentage, approximately 58.65%, of Eric's additional proven needs to Pinsker. *See* Tex. Fam. Code § 154.126(b) ("After the presumptive award is subtracted, the court shall allocate between the

17

parties the responsibility to meet the additional needs of the child according to the circumstances of the parties."). As for Field's remaining argument that not all of Pinsker's budgeted expenses are "directly related" to Eric's disability, we address that argument in his second issue below.

On this record, we cannot conclude that the district court abused its discretion in ordering Field to pay additional amounts of child support above the presumptive guidelines.

We overrule Field's first issue.

**Support amount for an adult child with a disability**

In his second issue, Field asserts that the evidence is insufficient to show that above-guideline child support was warranted under Texas Family Code section 154.306, which applies to disabled children over the age of eighteen. That statute provides:

> In determining the amount of support to be paid after a child's 18th birthday, the specific terms and conditions of that support, and the rights and duties of both parents with respect to the support of the child, the court shall determine and give special consideration to:
>
> (1) any existing or future needs of the adult child directly related to the adult child's mental or physical disability and the substantial care and personal supervision directly required by or related to that disability;
>
> (2) whether the parent pays for or will pay for the care or supervision of the adult child or provides or will provide substantial care or personal supervision of the adult child;
>
> (3) the financial resources available to both parents for the support, care, and supervision of the adult child; and
>
> (4) any other financial resources or other resources or programs available for the support, care, and supervision of the adult child.

18

Tex. Fam. Code § 154.306. "While section 154.306 provides for mandatory factors to be applied—indeed, 'specially considered'—after a disabled child reaches age 18," these are not "the sole or exclusive factors for courts to consider when setting child support for an adult disabled child." *In re J.M.W.*, 470 S.W.3d 544, 552-54 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Courts should consider these factors in addition to the other statutory guidelines for setting the amount of child support. *See id.* at 554. The record reflects that the district court considered each of these factors in its findings, as we discuss below.[3]

***Any existing or future needs of the adult child directly related to the adult child's mental or physical disability and the substantial care and personal supervision directly required by or related to that disability***

On this factor, the district court found the following:

[Eric] requires constant care and personal supervision because of his mental disability. [Eric] always requires the presence of a caregiver. This need for care and supervision extends to all aspects of his life, including, without limitation, personal care, hygiene, eating, getting ready for school, schoolwork, reading, interpersonal skills, communication skills, his physical safety and the physical safety of other[s], and managing his behaviors.

This need for care and personal supervision existed at the time of trial and is expected to continue indefinitely into the future.

These findings are supported by the record. Both parents testified to the severity of Eric's disability and the constant care that he requires as a direct result of his disability. Pinsker testified that Eric requires assistance with all his activities of daily living, and both

---

[3] Field challenges the sufficiency of the evidence of some of the district court's specific fact findings for the first time in his reply brief. These challenges are waived. *See Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied) (holding that "[a] party waives its challenges to the findings of fact and conclusions of law if it fails to raise them in its original appellate brief").

parents provided testimony tending to show that Eric was becoming increasingly violent and aggressive and more of a danger to others, including young children.

Field acknowledges that Eric "certainly requires substantial care and personal supervision," but he argues that "there was no evidence of the expenses related to such supervision or any evidence showing that his personal supervision currently or in the future were lacking and the expenses were necessary to fill that void." He also argues that not all of Pinsker's expenses were "directly related" to Eric's disability. However, Pinsker's testimony, summarized above, regarding the severity of Eric's disability supports a finding that all of Eric's current caregiving needs were directly related to his disability and that his need for constant care in the future was also directly related to his disability. *See Thompson v. Smith*, 483 S.W.3d 87, 96 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

### *Whether the parent pays for or will pay for the care or supervision of the adult child or provides or will provide substantial care or personal supervision of the adult child*

On this factor, the district court found the following:

Petitioner has paid for and will pay for the care or personal supervision of [Eric]. Although Petitioner personally provides and will provide care and personal supervision of [Eric] in the future, both Petitioner and Respondent work full-time. The spouses of both Petitioner and Respondent also work full-time. Thus, [Eric's] care and personal supervision has been and will be supplemented by care from third parties due to the parties' work obligations.

Petitioner's ability to rely on family members to provide care for has diminished, primarily due to [Eric's] violent behaviors.

Respondent was entitled to an equal possession schedule under the parties' Agreed Final Decree of Divorce but has not had possession of the Child for the full amount of time allowed under the Decree.

Respondent did not fulfill his promises to Petitioner to provide personal care for [Eric].

These findings are supported by the record. Pinsker and Field each testified that they cannot work full time while caring for Eric. Pinsker further testified that she needs care assistance from others because of her business but that she can no longer rely as heavily on family members to provide care for Eric because of his increasingly violent behavior. Therefore, she needed to rely more on professional caregivers moving forward.

As for Field, although he provided care for Eric and paid for Eric's ABA therapy, the district court could have found based on Pinsker's testimony that Field did not provide as much care as he could have under the terms of the divorce decree and that he had backed out on arrangements that he had made with Pinsker to provide care for Eric, thus making him a less reliable caregiver than Pinsker.

### *The financial resources available to both parents for the support, care, and supervision of the adult child*

On this factor, the district court made the following finding:

Both parents have financial resources from which they can pay for the supervision, care, and support of [Eric].

This finding is supported by the record. Both parents provided evidence from which the district court could find that they were both able to pay for increased supervision, care, and support of Eric, and although Pinsker has more income than Field, the district court would not have abused its discretion in finding that Field had sufficient financial resources to contribute to Eric's need for additional care moving forward.

*Any other financial resources or other resources or programs available for the support, care, and supervision of the adult child*

On this factor, the district court made several findings:

At the time of trial, [Eric] was enrolled in the Rosedale school, which provides care and personal supervision for him during regular school hours for approximately nine months out of the year. Beginning in June 2026, [Eric] will age-out of that school program, thus dramatically increasing the cost of care and personal supervision for [Eric] at that time.

The Extended School Year schedule offered by Rosedale has a schedule that is unworkable for the parties.

Respondent has enrolled [Eric] in an ABA therapy program, which provides 10-12 hours of care per week to [Eric]. The maximum amount of care the ABA therapy program will provide is 25 hours per week, but this amount of care was not available due to shortages of available therapists while the case was pending. [Eric's] previous enrollment in this program lasted a short duration, and it is difficult to find ABA therapists that serve someone of [Eric's] age. [Eric] may not continue to receive ABA therapy indefinitely.

The nature of [Eric's] disability renders hiring a traditional babysitter unworkable. The nature of [Eric's] disability renders attendance at traditional summer camps unworkable. His disability requires a caregiver with experience to meet [Eric's] needs and keep [Eric] and others safe, thus increasing the cost of [Eric's] care and presenting challenges to finding adequate care.

Respondent has explored other programs that might provide care for [Eric], but the programs have lengthy waiting lists, [Eric] has not yet been approved for such programs, or [Eric's] eligibility for such programs is unknown.

These findings are supported by the record. Rosedale will no longer be an option for Eric moving forward, and that school was responsible for a large portion of Eric's care during the week. Rosedale's extended school-year schedule offered only a few hours of care per day, which made it difficult on Pinsker's schedule. ABA therapy was difficult to set up, and

22

according to Pinsker, Eric could not attend those therapy sessions indefinitely; he would eventually "age out" of the system. Although both parents were exploring additional care options for Eric, they had not yet had success. Additionally, Field's application for Social Security benefits for Eric had been denied, and Pinsker's application for Social Security was still pending. The district court could have found from the evidence in the record that there were limited programs available to help Eric, limited caregivers who could care for him, and limited financial resources to pay for whatever care they could find, other than the incomes of Pinsker and Field. For these reasons, the district court would not have abused its discretion in ordering Field to pay additional child support to Pinsker for the care of their adult child.

We overrule Field's second issue.

## CONCLUSION

We affirm the district court's order modifying its prior order.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: June 26, 2026

23